**Richard E. FINLAN and Don Venable, Plaintiffs,**

v.

**CITY OF DALLAS, et al., Defendants.**

**No. 3:95–CV–0386–X.**

United States District Court,
N.D. Texas,
Dallas Division.

June 6, 1995.

Richard E. Finlan, Dallas, TX, pro se.

Don NMI Venable, Dallas, TX, pro se.

Edwin Armstrong Price Voss, Jr., Atty. at Law, Mary Lou Shipley, Atty. at Law, Dallas City Attys. Office, Dallas, TX, for defendant City of Dallas, TX.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

On May 1, 1995 the Court held a hearing on Plaintiffs' request for Permanent Injunction for Violation of the Texas Open Meetings Act, filed as a part of the Plaintiffs' Amended Petition on March 6, 1995. During the hearing the Court heard testimony as well as oral argument. On May 10, 1995, the Court issued a Temporary Restraining Order. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court now sets forth more fully its findings of fact and conclusions of law concerning the injunctive relief granted on May 10, 1995, and issues a preliminary injunction.

*Creation of the Downtown Sports Development Committee*

Unless provided otherwise, all powers conferred on the City of Dallas are exercised by the City Council, which is comprised of the Mayor and fourteen other members.[1] Nine members constitute a quorum of the City Council unless there are vacancies on the City Council.[2] The Mayor appoints the members and chairs of all City Council committees.[3]

---

1. Dallas City Charter, Ch. III, §§ 1–2.

2. City Charter, Ch. III, § 9.

3. City Charter, Ch. III, § 13(b).

At the suggestion of City Manager John Ware,[4] in January 1995 the Mayor appointed an Ad Hoc Committee—Downtown Sports Development Project (hereinafter referred to as the Downtown Sports Development Committee) comprised of City Council members Chris Luna (who serves as Chairman), Don Hicks, Barbara Mallory, Bob Stimson, and Glenn Box.[5] For several months, Donald Carter, the owner of the Dallas Mavericks professional basketball team, and Norm Green, the owner of the Dallas Stars professional hockey team, have indicated that they are considering moving their teams out of the City-owned Reunion Arena to the suburbs of Dallas unless Reunion Arena is substantially modified or a new facility built in its place. These matters have generated a fair amount of public interest and media attention.

Plaintiffs seek injunctive relief, asserting that the Downtown Sports Development Committee has met with third parties in closed meetings in violation of the Texas Open Meetings Act[6] (hereinafter referred to as the TOMA). The City maintains that the Committee is not subject to the TOMA, but even if it is subject to its provisions, the closed meetings are proper within the real estate exception to the TOMA. Based upon the evidence presented at the hearing, the argument and briefing of counsel, and the Court's *in camera* inspection of tape recordings of the Committee's closed meetings, the Court concludes that the Downtown Sports Development Committee has acted in violation of the TOMA.

## The Texas Open Meetings Act

[1] According to the Dallas City Charter, City Council committee meetings must be open to the public as mandated by state law.[7] With certain exceptions, the TOMA provides that every "regular, special, or called meeting of a governmental body shall be open to the public."[8] Will Pryor & Robert M. O'Boyle, *Public Policy ADR: Confidentiality in Conflict?*, 46 SMU L.Rev. 2207, 2217 (1993). A narrow and restrictive reading of the TOMA as applied to committee meetings of the Dallas City Council would make Dallas City Charter Chapter III, § 8 meaningless. The provisions of the TOMA should be liberally construed to effect its purpose. *Toyah I.S.D. v. Pecos–Barstow I.S.D.*, 466 S.W.2d 377, 380 (Tex.Civ.App.—San Antonio 1971, no writ). The Court finds that, unless encompassed within an exception, meetings of the Downtown Sports Development Committee must be open to the public.

■ A governmental body may convene in executive session (referred to as a "closed meeting" in the revised TOMA) only where specifically authorized by law. Op.Tex.Att'y Gen. No. LO 94–063. The Downtown Sports Development Committee may conduct a closed meeting (a meeting to which the public does not have access) to consult with the City Attorney under certain circumstances,[9] or "to deliberate the purchase, exchange, lease, or value of real property if deliberation in an open meeting would have a detrimental effect on the position of the governmental body in negotiations with a third person."[10] The Committee may confer with city employees in a closed meeting if the meeting's only purpose is to receive information from or to ask questions of the city employees. During such a conference, the Committee members may not deliberate public business or agency policy that affects public business.[11]

4. Testimony of City Manager John Ware, Transcript of May 1, 1995 Hearing [hereinafter Tr.] at 66–67.

5. Testimony of City Manager John Ware, Tr. at 58.

6. Tex.Gov't Code Ann. §§ 551.001 *et seq.*

7. City Charter, Ch. III, § 8.

8. Tex.Gov't Code Ann. § 551.002.

9. Tex.Gov't Code Ann. § 551.071. Under this exception, a governmental body may hold a closed meeting with its attorney to seek or to receive the attorney's advice with respect to a specific pending or contemplated legal proceeding or legal matters. General discussion of policy, unrelated to legal matters, is not permitted under this attorney consultation exception merely because an attorney is present. Op.Tex.Att'y Gen. No. JM–100 (1983).

10. Tex.Gov't Code Ann. §§ 551.001, 551.072.

11. Tex.Gov't Code Ann. § 551.075. A closed meeting may also be held under other circumstances, such as to deliberate a prospective gift,

Notice of meetings of the Downtown Sports Development Committee, whether open or closed, must be posted in a place readily accessible to the general public at all times for at least 72 hours before the scheduled time of the meeting, unless the meeting is an "emergency meeting" under the TOMA.[12] The Court finds that none of the meetings of the Committee held thus far were "emergency meetings" as defined by the TOMA. When holding a closed meeting, the Committee must either keep a certified agenda or make a tape recording of the proceedings, except for a consultation with the City Attorney under § 551.071.[13] This provides a method of verifying in court proceedings that closed meetings comply with the TOMA. Op.Tex.Att'y Gen. No. JM–840 (1988).

■ When a closed meeting is permitted under the TOMA, the Downtown Sports Development Committee must first convene a quorum of the Committee in an open meeting, for which proper notice has been provided, and during which the presiding member publicly announces that a closed meeting will be held, and identifies under which section of the TOMA the closed meeting will be held.[14] The advance notice should specifically and fully disclose the subjects to be considered at the upcoming meeting. *Cox Enterprises, Inc. v. Board of Trustees of Austin I.S.D.*, 706 S.W.2d 956, 959–60 (Tex.1986). If one of the exceptions to the TOMA does not apply and the Committee holds a closed meeting, then the closed meeting is violative of the statute regardless of whether the Committee complied with the procedural steps. *Martinez v. State*, 879 S.W.2d 54, 56 (Tex.Crim. App.1994) (en banc).

A member of the Downtown Sports Development Committee commits a criminal offense if he or she knowingly conspires with other Committee members to circumvent the TOMA by meeting in numbers less than a quorum for the purpose of closed deliberations in violation of the TOMA. Such criminal offense is a misdemeanor punishable by a fine, confinement in the county jail, or both.[15] A member of the Committee commits a criminal offense if a closed meeting is not permitted under the TOMA and the member knowingly: calls or aids in calling or organizing the closed meeting; closes or aids in closing the meeting to the public; or participates in the closed meeting. Such criminal offense is a misdemeanor punishable by a fine, confinement in the county jail, or both.[16]

■ The purpose of the Texas Open Meetings Act is to protect the public's interest in knowing the workings of its governmental bodies. *Cox Enterprises, Inc. v. Board of Trustees of Austin I.S.D.*, 706 S.W.2d 956, 960 (Tex.1986). As the Texas Supreme Court has observed, citizens "are entitled not only to know what government decides but to observe how and why every decision is reached. The explicit command of the statute is for openness at every stage of the deliberations." *Acker v. Texas Water Commission*, 790 S.W.2d 299, 300 (Tex.1990). The willingness of the City Council and the Downtown Sports Development Committee to comply with the TOMA "should be such that the citizens of Texas will not be compelled to resort to the courts to assure that a public body has complied with its statutory duty." *Cox Enterprises* at 960.

■ Thus, the public policy embodied in the TOMA is that, absent compelling reasons to the contrary, the public business should be conducted in public. In our country, we have a basic belief that in a democracy the people do not need their government to protect them from themselves.

In litigation involving an alleged violation of the TOMA, the Court is entitled to make an *in camera* inspection of tape recordings of closed meetings.[17] These tape recordings

---

which the Court finds are inapplicable to this case. Tex.Gov't Code Ann. § 551.073.

**12.** Tex.Gov't Code Ann. §§ 551.041, 551.043, 551.045.

**13.** Tex.Gov't Code Ann. § 551.103.

**14.** Tex.Gov't Code Ann. § 551.101.

**15.** Tex.Gov't Code Ann. § 551.143.

**16.** Tex.Gov't Code Ann. § 551.144.

**17.** Tex.Gov't Code Ann. § 551.104.

are confidential under the Texas Open Records Act [18] unless a court rules otherwise in an action under the TOMA.[19] At the hearing on May 1, 1995, the City Attorney's office tendered for *in camera* inspection the tape recordings of all of the closed sessions of the Downtown Sports Development Committee meetings for which tape recordings were made. There were several meetings which were not recorded as required by the TOMA. The Court has listened to the tape recordings, and bases these findings of fact and conclusions of law in part on information derived from these tape recordings, as well as the evidence adduced at the May 1, 1995 hearing.

*Plaintiffs' Standing*

■ An interested person may bring an action by injunction to stop, prevent, or reverse a violation or threatened violation of the TOMA by members of a governmental body.[20] The Court finds that Plaintiffs Richard Finlan and Don Venable, taxpayer citizens of the City of Dallas, have clearly demonstrated a keen interest (although such an interest is not necessary) in the workings of their government. The Court finds that Plaintiffs are therefore "interested persons" with standing to seek an injunction against violations of the TOMA by members of the Downtown Sports Development Committee. *City of Fort Worth v. Groves,* 746 S.W.2d 907, 913 (Tex.App.—Fort Worth 1988, no writ).

*The Committee is Subject to the TOMA*

The City contends that meetings of the Downtown Sports Development Committee

are not subject to the TOMA.[21] The City Charter,[22] as well as the Council's own rules, contradicts that position. Section 9 of the Dallas City Council Rules of Procedure [23] establishes certain standing committees of the City Council, empowers the Mayor to appoint ad hoc committees as needed (like the one involved here), and delineates the rules governing City Council committees. Section 9.3(c) explicitly provides that "Committee meetings must be conducted in accordance with the Texas Open Meetings Act." There is no provision in these rules exempting ad hoc committees from compliance with the TOMA.[24]

■ The City Council has therefore enshrined in its rules of procedure that its ad hoc committee is a "governmental body" subject to the TOMA. The City is bound by the restraints of its charter and its rules. *Shackelford v. City of Abilene,* 585 S.W.2d 665, 668 (Tex.1979). In addition, on the advice of City Attorney Lindsay after complaints by the Plaintiffs,[25] the Downtown Sports Development Committee began acting as if the Committee believed it was subject to the TOMA by posting notice of its meetings and in other ways complying with procedural aspects of the TOMA.

The City argues that the TOMA does not apply to the Downtown Sports Development Committee of five members, since that number is less than a quorum (nine members) of the full City Council (fifteen members). A quorum of the Committee itself, however, is just three members.[26] Indeed, at least one posted meeting of the Committee was can-

---

18. Tex.Gov't Code Ann. §§ 552.001—552.353.

19. Tex.Att'y Gen. ORD–495 (1988).

20. Tex.Gov't Code Ann. § 551.142.

21. Closing Argument of Assistant City Attorney Ed Voss, Tr. at 177–79.

22. Dallas City Charter, Ch. III, § 8.

23. Admitted into evidence as Defendant's Exhibit 8.

24. The Court observes that the Downtown Sports Development Committee has been in violation of

the City Council rules from the moment of its existence. Section 9.4 of the City Council Rules of Procedure states that "[t]he ad hoc committee shall be established for a designated period of time which may be extended by the mayor and shall meet as needed." Mayor Bartlett's memorandum establishing the Committee fails to designate a time period. Committee Chairman Luna acknowledged that no time period for the Committee's existence was ever specified. Tr. at 111–12.

25. Testimony of City Attorney Sam Lindsay, Tr. at 156.

26. Testimony of Committee Chairman Chris Luna, Tr. at 102.

celed as a result of the failure to have a quorum of three members present.[27]

The City contends that "[i]f the court were to take Plaintiffs' position to its logical conclusion, then the absurd result follows that two City Councilmembers could not meet with any constituents regarding any issue without first posting notice of the meeting 72 hours in advance, and comply with other requirements of the Open Meetings Act." [28] This hypothetical bears little resemblance to the real circumstances of the Downtown Sports Development Committee. The Committee is not a meeting of two Council members with constituents, but five members as an official committee appointed by the Mayor for the purpose of negotiating [29] behind closed doors with third parties, involving millions of dollars of taxpayer money with no public input, in violation of the City Charter and City Council rules as well as a fair reading of the TOMA itself in light of the strong public policy considerations for which the law was created.[30] The Court need not look to "logical conclusions" but at what was actually said and done on the tapes.

The Court finds a recent Attorney General opinion to be persuasive on this point: "a governmental body also holds a meeting covered by the Open Meetings Act when a quorum of members is present and meets with a third party about the public business or policy over which the body has jurisdiction." Op.Tex.Att'y Gen. No. DM–191 (1992). The Committee itself is the party of the first part, City employees (staff) are second parties, and all others are third parties within the context of DM–191. Clearly the closed meetings of the Downtown Sports Development Committee are encompassed within the definitions of "meeting" [31] and "deliberation" [32] in the TOMA. On the tape recordings, there is both an exchange with other persons (Mavericks representatives) *and* the Committee members "deliberate" among themselves.

The City's argument raises the concern that the real danger exists that the full City Council is merely a "rubber stamp" of the Committee, and its closed meetings deprive the public of access to the decision-making process. Op.Tex.Att'y Gen. No. H–3 (1973); Op.Tex.Att'y Gen. No. DM–95 (1992). On the tape recordings it is clear that none of the five Committee members voices an objection—all are pro-arena.[33] With the five

---

**27.** Id.

**28.** Supplemental Response of Defendant City of Dallas to Plaintiffs' Application for Injunctive Relief at 6.

**29.** See Mayor Bartlett's memo, admitted as Defendant's Exhibit 6, creating the Committee "to assist the city manager with the negotiations for this project" and City Attorney Lindsay's memo, admitted as Plaintiffs' Exhibit 6, referring to the Committee as the "negotiating team."

**30.** Apparently, it didn't matter to the Committee members that their meetings might be subject to the TOMA.

THE COURT: Before you started posting the meetings, there was a meeting that was held that was not posted prior to February 21 with Mr. Carter and—Don Carter, Ron Carter, and Norm Sonju. Do you remember that meeting?

MR. LUNA: Yes, sir.

THE COURT: Okay. And did you believe that it wasn't required that it be posted because you didn't believe it fell within the Act?

MR. LUNA: Correct.

THE COURT: Was that based upon advice of counsel?

MR. LUNA: Judge, to be honest with you, I don't think we ever talked about it. I mean, it was—we formed the group, the mayor did the memo, we made a meeting with the Carters, and we went out and met.

And it was—I don't think we specifically asked a lawyer or what the lawyers really told us. Testimony of Committee Chairman Chris Luna, Tr. at 144.

**31.** "Meeting" means a deliberation between a quorum of a governmental body, or between a quorum of a governmental body and another person, during which public business or public policy over which the governmental body has supervision or control is discussed or considered or during which the governmental body takes formal action. Tex.Gov't Code Ann. § 551.001(4).

**32.** "Deliberation" means a verbal exchange during a meeting between a quorum of a governmental body, or between a quorum of a governmental body and another person, concerning an issue within the jurisdiction of the governmental body or any public business. Tex.Gov't Code Ann. § 551.001(2).

**33.** Although Committee Chairman Luna testified that "the goal was to have the group kind of representative of the Council", Tr. at 106, and "the five members selected represented the dif-

members of the Committee in favor of a new arena, as well as the Mayor who appointed them, only two more votes are needed from the remaining nine City Council members to go along with whatever deal the Committee cuts.

The Court asked each of the witnesses at the hearing why there was no quorum of the full City Council. The Court never received a straight answer, and finds this to be circumstantial evidence that the Committee was designed to circumvent the TOMA. The testimony to the Court was that time is of the essence, and there are many details to work out in this very complicated transaction.[34] While the tape recordings show this to be true, the tape recordings also demonstrate that the Committee is not merely providing "advice" or "fact-finding." The tapes show the members are all actively participating in cutting a deal behind closed doors. Since time is of the essence, whatever this Committee negotiates will have the benefit of at least five votes being already in place from the beginning.

Plaintiffs invite the Court to rule that the Attorney General opinions cited in this opinion "amount to good public policy and that subcommittees of governmental bodies are 'governmental bodies' within the definition of the Act and that such committees are bound to follow the 'notice' and 'open meetings' provisions of the Open Meetings Act."[35] The Court, however, cannot determine this based upon what the Court may think is good public policy, but finds that the Downtown Sports Development Committee is subject to the TOMA because of serious questions from

the circumstantial evidence that the Committee was appointed, in part, to circumvent inclusion of the entire City Council and the public in debating this very important issue. Furthermore, as discussed above, under the City Charter and Council rules the City itself has chosen to put the meetings under the purview of the TOMA, and this Committee has acted in part as if it believed it was subject to the TOMA.

The City analogizes the Downtown Sports Development Committee to the city grievance committee in *City of Austin v. Evans*, 794 S.W.2d 78 (Tex.App.—Austin 1990, no writ). The Court discerns several significant distinctions between the two committees, however, so that the *City of Austin* case is not controlling as to this case. The Austin grievance committee was not a department, agency, or political subdivision of the City of Austin, or appointed by the Austin city council (grievance committee members were elected by city employees), as the Dallas committee was (through Council member Bartlett, in his role as Mayor). The most important distinction is that there is no indication that the Austin city council explicitly placed the grievance committee under the provisions of the TOMA, as the Dallas City Council does with its committees, nor did the Austin grievance committee *act* like it was subject to the TOMA, as the Downtown Sports Development Committee has done.

*Real Estate Exception of the TOMA*

■ As previously noted, the Downtown Sports Development Committee "may conduct a closed meeting to deliberate the purchase, exchange, lease, or value of real prop-

---

ferent viewpoints of the Council", Tr. at 108, the Court finds the following exchange revealing:

THE COURT: Have any councilmembers come out publicly as being opposed to the construction of a new arena?

MR. WARE: Yes.

THE COURT: Who would those be?

MR. WARE: Well, you have—I don't want to use the word opposed. But the two that are generally recognized as not being in favor of, Mr. Fielding and Ms. Blumer, and Mr. Garcia has—

THE COURT: He wants a vote. He wants everyone to vote. Any others?

MR. WARE: No, sir.

THE COURT: And, of course, those three aren't on this five-person committee.

MR. WARE: No, sir.
Testimony of City Manager John Ware, Tr. at 68.

**34.** Testimony of City Manager John Ware, Tr. at 66 and 76–77; Testimony of Committee Chairman Chris Luna, Tr. at 117–18.

**35.** Finlan's Brief in Support of Injunction Against City of Dallas for Violation of Texas Open Meetings Act at 3.

erty if deliberation in an open meeting would have a detrimental effect on the position of the [Committee] in negotiations with a third person." [36] The City asserts that its closed meetings with Mavericks representatives and real estate owner Woodbine Development Corporation representatives are encompassed within this real estate exception. The City's interpretation misreads the provision. The members of the Committee "may consult with their employees in private, but may not consult with other third parties in private." Op.Tex.Att'y Gen. No. DM–191 (1992).

 The real estate exception was created to keep a governmental entity from having to "telegraph its punch" in an open meeting to the detriment of the taxpayers, not to use it as a blank check to cut a deal in private, devoid of public input or debate. It is perfectly proper for the City Manager to inform the Committee or the full City Council in a closed meeting of the status of his negotiations with Mavericks representatives, Woodbine representatives, or other third parties. What is improper is to permit a third party access to the Committee's deliberations, enabling that person to gain access to the City's confidential information which might possibly then be used to negotiate against the City with another entity. When third parties are allowed into closed meetings where they can observe the City's delibera- tions, the privilege is waived so that the public cannot be legitimately shut out. The Court agrees with the Plaintiffs that the real estate exception protects the negotiating position of the City. It is not a license to conduct the affairs of government in secret.

*Contrast Between the Committee's "Purpose" and its Actions*

The purpose of the Downtown Sports Development Committee as set forth by Mayor Bartlett was "to assist the city manager with the negotiations for this project." [37] According to City Manager Ware, the Committee was "to listen and to observe the negotiations" and to "offer any suggestions they want to offer." [38] The City Manager emphasized that he alone, and not the Committee members, had the authority to negotiate on the City's behalf.[39] The purpose of the Committee (as acknowledged by City Council member and Committee Chairman Chris Luna) was to assist the City Manager and to be the "eyes and ears" of the City Council.[40]

The City contends that the Committee "takes no action at the meetings in which the committee is held," doesn't engage in "negotiations" [41] and is "advisory only." [42] The tape recordings of the closed meetings demonstrate the opposite. Contrary to the sworn testimony of City Manager Ware [43]

---

36. Tex.Gov't Code Ann. § 551.072.

37. Memorandum from Mayor Steve Bartlett to the Dallas City Council (Jan. 20, 1995) (admitted into evidence as Defendant's Exhibit 6).

38. Testimony of City Manager John Ware, Tr. at 57.

39. The "basic and fundamental issue, is that the Council doesn't have the authority to do the deal. I am the only one authorized to do the deal, whoever occupies the chair I sit in." Tr. at 58. Responding to the question that "the City Council members do not have any jurisdiction over negotiating contracts, do they?", the City Manager testified, "No, they do not. That's why they haven't been negotiating." Tr. at 69.

40. Testimony of Committee Chairman Chris Luna, Tr. at 140.

41. Negotiation: discussion to bring about some result, especially involving bargaining. The New Lexicon Webster's Dictionary 669 (1988).

42. Supplemental Response of Defendant City of Dallas to Plaintiffs' Application for Injunctive Relief at 3–4.

43. Q. Does the committee itself do negotiating?

A. No.

Q. Who does the negotiating?

A. I do.
Testimony of City Manager John Ware, Tr. at 71.

Q. Regarding the councilmembers' actions during the course of the meetings with Don Carter, would you characterize them as entering into negotiations with Mr. Carter?

A. No, I would not.

Q. Would you characterize what they do as discussions with Mr. Carter?

A. I would characterize them as observing and asking questions for clarification.
Testimony of City Manager John Ware, Tr. at 79–80.

and the sworn testimony of Council member Luna,[44] throughout the tapes of the closed meetings, Committee members are heard to engage very actively in negotiations with the Mavericks representatives. Not only did Council member Luna negotiate, but he frequently took the lead in the negotiations. What the Court was told under oath by these public officials does not square with what is on the tapes. Even City Attorney Lindsay refers to the Committee as "the arena negotiating team."[45]

44. Q. Did you have authority to negotiate with third parties on the sports arena?
A. The committee was not negotiating with third parties. Mr. Ware was negotiating with third parties.
Testimony of Committee Chairman Chris Luna, Tr. at 113.
Q. So in summation, you're saying that this committee is not negotiating with any third parties. Is that correct?
A. Correct.
Testimony of Committee Chairman Chris Luna, Tr. at 116.

45. Memorandum from City Attorney Sam A. Lindsay to Councilmember Donna Blumer (Mar. 21, 1995) (admitted into evidence as Plaintiffs' Exhibit 6). In addition, some of the Committee members' own time records refer to Committee meetings as "arena negotiation team meetings" (admitted into evidence as Plaintiffs' Exhibit 5).

46. Supplemental Response of Defendant City of Dallas to Plaintiffs' Application for Injunctive Relief at 3.

47. Although initially reluctant to acknowledge it, City Manager Ware conceded that the Committee would, in fact, make recommendations to the full City Council.
THE COURT: Is it envisioned that these five City Council persons sitting there with their eyes and ears open are going to go back to their colleagues in executive session and make recommendations to the full Council? Is that why they are really there?
MR. WARE: No. I make the recommendations to the City Council. Now, the advisory committee have answered questions of the City Council.
THE COURT: This ad hoc committee?
MR. WARE: Yes.
THE COURT: So they are making recommendations.
MR. WARE: In some instances, I guess technically you could say that, but—
THE COURT: What I can't figure out in this whole deal is, what is their mission? Why are

The City also contends that the Committee "has no formal recommendation, rulemaking or quasi-judicial authority,"[46] so that the TOMA does not apply. Whether or not the Committee has formal authority to recommend a particular course of action, the tape recordings of the closed meetings indicate that the Committee is going to do just that, and the members are in fact "briefing" other Council members after their closed meetings. The testimony of City Manager Ware[47] and Council member Luna[48] that the Committee

they there if they are not there to be players in the process?
MR. WARE: Well, they are there, Judge— there's no nefarious plot. They are there to—
THE COURT: That's what I am saying. I am not so sure there is a nefarious plot, but the way everyone is doing it, going about everything cloak and dagger instead of just doing it in executive session with the full Council, it makes it look like that when it may not be that way, unnecessarily so.
MR. WARE: As I have indicated, it is just impractical to have the fifteen councilmembers and four representatives of the Mavericks and the staff in one room trying to negotiate this. They do respond to questions the City Council might ask.
THE COURT: So they are—the committee is going to be conferring and making recommendations on what they think.
MR. WARE: Sure.
Testimony of City Manager John Ware, Tr. at 71–73.
One problem, among several with this, is that *if* the truth is as Chairman Luna and City Manager Ware testified under oath that the Committee was *"not negotiating"* (see Footnote 43, supra) and was to *only* be the Council's "eyes and ears" (see Footnote 40, supra) there is no reason why the Council couldn't have 15 sets of "eyes and ears." The truth is here disclosed when City Manager Ware observes how "impractical" it would be to have "fifteen councilmembers ... in one room trying to *negotiate* this." (his words, emphasis added) The unspoken, yet obvious implication is that it is not impractical to have five councilmembers *negotiate*. The tapes demonstrate that is exactly what they (the five Committee members) did.
Frankly, in light of the tapes, memos, and internal inconsistency of the testimony, the Court finds the sworn testimony given at the May 1 hearing more than a little troubling.

48. Referring to the Committee, Committee Chairman Luna declared, "We had no power to make recommendations." Tr. at 124. This appears to contradict the sworn testimony of City Manager Ware shown in Footnote 47.

has no power to make recommendations to the full City Council is contradicted by the tapes of the meetings. The City's assertions that the Downtown Sports Development Committee is not a rubber stamp, has no authority, isn't making decisions, and is advisory only are belied not only by common sense, but the tapes of the meetings themselves. The question is, if they aren't doing anything or taking an active role (which the tapes amply demonstrate that they are), who needs them?

*Committee Violations of the TOMA*

The Court finds, based upon the testimony of City Manager John Ware,[49] City Council member Chris Luna,[50] and City Attorney Sam Lindsay,[51] that, on the advice of City Attorney Lindsay, the first two meetings of the Downtown Sports Development Committee, which were closed meetings, had no notice posted in violation of TOMA § 551.041, and were not tape recorded [52] in violation of TOMA § 551.103. It is a Class C misdemeanor for members to participate in a closed meeting knowing that a tape recording of the closed meeting is not being made.[53]

By its Charter, the City of Dallas has chosen to make its committee meetings open meetings *and* subject to the TOMA. Therefore, the Court finds that those non-posted, non-taped closed meetings of the Downtown Sports Development Committee were in violation of the TOMA and the Committee members, elected officials, who participated in those meetings violated TOMA § 551.144. Arguably, the City does not have to bring its Committee meetings under the purview of the TOMA, absent an intent to circumvent the law by meeting in numbers less than a quorum, but once, as here, the City chooses to do so, it must do so.

At least one of these closed Downtown Sports Development Committee meetings which was not posted and not tape recorded was with Dallas Mavericks owner Donald Carter and other Mavericks representatives.[54] Several of the subsequent posted, tape recorded closed Committee meetings were with Carter and Mavericks representatives and, separately, with representatives of Woodbine Development Corporation,[55] who owns land which the City may purchase for the construction of a new sports facility.[56] The Court finds, based upon the testimony of City Council member Chris Luna [57] and City Attorney Sam Lindsay,[58] that it was only after criminal complaints by the Plaintiffs to

---

49. Testimony of City Manager John Ware, Tr. at 39–40.

50. Testimony of Committee Chairman Chris Luna, Tr. at 103.

51. Testimony of City Attorney Sam Lindsay, Tr. at 155–56.

52. Testimony of City Manager John Ware, Tr. at 43; Testimony of Committee Chairman Chris Luna, Tr. at 144–45.

53. Tex.Gov't Code Ann. § 551.145.

54. Testimony of Committee Chairman Chris Luna, Tr. at 103–04.

55. However, the Court was not provided a tape recording of the meeting with Woodbine.

56. Testimony of Committee Chairman Chris Luna, Tr. at 105.

57. Testimony of Committee Chairman Chris Luna, Tr. at 105–06.

58. Q. There has been some discussion, Mr. Lindsay, about how the first two meetings of this ad hoc committee were not posted and were not conducted under the Open Meetings Act, whereas now they are.

Do you have any personal knowledge about how that came about?

A. Yes, I do.

Q. And what is your recollection about that?

A. Okay. I may be a little fuzzy on the dates, but basically sometime in late January I got a call from the District Attorney's office concerning a complaint by Mr. Finlan or Mr. Venable that those meetings could possibly violate a provision of the Texas Open Meetings Act.

I discussed that in detail several times with Mr. Clark Birdsall of the District Attorney's office and he said he could not say one way or another whether that would be a violation but since that involved public officials, or the alleged violation involved public officials, the District Attorney's office's longstanding practice was to refer it to a grand jury.

And so to avoid any appearance of impropriety or wrongdoing, my advice to the Council was, let's just go ahead and post this and clear this up because the District Attorney could not give us a definitive answer.
Testimony of City Attorney Sam Lindsay, Tr. at 155–56.

the District Attorney about the closed meetings of the Committee, and the District Attorney's decision to refer the matter to a Dallas County grand jury, that City Attorney Lindsay then advised that notice of future meetings of the Committee should be posted as required under the TOMA. The City, which seems so sure of its position now, chose not to litigate the matter then.

The Court also finds that the tape recordings of the Committee meetings that were taped were not recorded in accordance with the TOMA. Several times during various meetings the tape recorder was obviously turned off and then on again. Some Committee members joke about this on the tapes. There is no provision in the TOMA which permits a governmental body to selectively tape its proceedings, as the Committee has done.

In addition, the Court finds that, when notice of a Committee meeting was posted, that the notice provided to the citizens of Dallas was insufficient under the TOMA. The Court has examined the notices posted by the City Secretary of Downtown Sports Development Committee meetings scheduled over ten dates between February and April 1995.[59] These notices merely state the date, time, and place of a closed meeting of the Committee, with the phrases "Deliberation Regarding Real Property under Sec. 551.072 of the Texas Government Code (T.O.M.A.)" and "Attorney Consultation under Sec. 551.071 of the Texas Government Code (T.O.M.A.)."

■ As clearly mandated by the *Cox Enterprises* decision of the Texas Supreme Court, such advance notice should specifically and fully disclose the subjects to be considered at the upcoming meeting. The Committee notices are woefully inadequate. They merely parrot the statute, failing to disclose the specific subject matter or the outside participants invited to a particular meeting. The Court considers this notice to be no notice at all.

As expected public interest in a particular subject increases, notice must become more specific. *Point Isabel I.S.D. v. Hinojosa*, 797

S.W.2d 176, 180 (Tex.App.—Corpus Christi 1990, writ denied). Few matters are likely to be of more interest to the citizens of Dallas in the months ahead and in fact have generated public interest and media attention than the proposed $141 million arena and the potential for the Mavericks and Stars moving to the suburbs. The Court directs the City Secretary to post adequate, specific, and detailed advance notice of future Committee meetings to bring the City into compliance with the TOMA.

The Court is also concerned by matters not strictly covered by the real estate exception being discussed, as revealed by the tapes. It is true that all the Court listened to was at least tangentially related to "real estate" in that it was about the Arena project. But much was said about legislative agendas and initiatives to create special tax districts, various sources of tax revenue, both new and old, as well as other financing matters, general in nature. Disclosure of many of these matters would not necessarily be detrimental to the City's position.

■ It is questionable whether these policy discussions and "deliberations" fall under the real estate exception of the TOMA. The exception, again, speaks to matters that, if disclosed publicly, would put the City at a negotiating disadvantage, as where disclosing what the City would be willing to pay for a piece of land would be detrimental. It is hard to see how this specific, limited, and narrow exception applies to lobbying plans in the Texas legislature. The attorney consultation and real estate exceptions are not magic talismans that can be dragged out every time a body subject to the TOMA wants to have a secret meeting.

*Preliminary Injunction*

■ The function of a preliminary injunction is to preserve the *status quo* and to prevent irreparable loss of rights prior to judgment. *Compact Van Equip. Co. v. Leggett & Platt Inc.*, 566 F.2d 952, 954 (5th Cir.1978). The decision to grant a preliminary injunction is discretionary with the district court, and is to be treated as the excep-

---

**59.** Admitted into evidence as Defendant's Exhibit 5.

tion rather than the rule. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir.1985). To obtain a preliminary injunction, a party must show: 1) a substantial likelihood of success on the merits; 2) a substantial threat of irreparable injury if the injunction is not granted; 3) that the threatened injury to the movant outweighs the threatened injury to the nonmovant; and 4) that the granting of a preliminary injunction will not disserve the public interest. *Cherokee Pump & Equip. Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974).

■■■ The first factor, a showing of a substantial likelihood of success on the merits, does not require that the movant prove his case. *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n. 11 (5th Cir.1991). It is enough that the movant has raised questions going to the merits so substantial as to make them fair ground for litigation and thus for more deliberate investigation. *Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D.Tex.1991). As discussed above, the Court concludes that the Downtown Sports Development Committee has conducted closed meetings with third parties in violation of the TOMA. The Court concludes that Plaintiffs have satisfied the requisite showing of substantial likelihood of success on the merits.

■■■ The second factor is a substantial threat of irreparable injury if the injunction is not granted. An injury is irreparable if it cannot be undone through monetary remedies. *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir.1981). To show irreparable injury if the threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable. The movant need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm. *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.1986). The Court determines that Plaintiffs and the other taxpayers of Dallas would be irreparably harmed by their elected officials continuing to violate the TOMA, a harm that monetary damages cannot address. Thus, the Court concludes that Plaintiffs have demonstrated a substantial threat of irreparable injury if a preliminary injunction is not granted.

■■■ The third factor is that the threatened injury to the movant outweighs the threatened injury to the nonmovant. It is not enough for the movant to demonstrate harm of the same magnitude as would be suffered by the nonmovant if the injunction is issued, and the balance of harm is not presumed in the movant's favor merely by a showing of substantial likelihood on the merits. *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389–91 (5th Cir.1984). The Court has concluded that Plaintiffs will be irreparably harmed if the Committee is not enjoined from future violations of the TOMA. That statute and the City Charter provide a lawful, effective means for the City to accomplish its goal of negotiating a financially beneficial deal for its taxpayers with respect to the proposed new arena. The Court finds that the City has demonstrated no potential harm to it from meeting in compliance with the TOMA and concludes that, balancing the harms, the threatened injury to the Plaintiffs outweighs the threatened injury to the City.

■■■ The fourth and final factor is that the granting of a preliminary injunction will not disserve the public interest. As the Court has previously observed, "the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Nobby Lobby, Inc. v. City of Dallas*, 767 F.Supp. 801 (N.D.Tex.1991) (Sanders, C.J.), *aff'd*, 970 F.2d 82 (5th Cir.1992). Guided by this principle, and considering all of the factors discussed above, the Court concludes that a preliminary injunction will not disserve the public interest.

*Disclosure of the Committee Tape Recordings*

In the Temporary Restraining Order filed May 10, 1995, the Court ordered that tape recordings of future closed meetings of the Downtown Sports Development Committee be tendered immediately to the Court for *in camera* inspection to assure compliance with

the TOMA. It is hereby ORDERED that this particular instruction shall remain in effect until the preliminary injunction is lifted or otherwise resolved by the Court. It is clear from comparing the sworn testimony to the tape recordings that the recordings are the citizens' best hope of keeping their government law-abiding.

 As for the tape recordings of prior meetings tendered to the Court in the May 1, 1995 hearing, the Court concludes that the tapes contain confidential and proprietary information so that the tapes shall not be released to the public. Fed.R.Civ.P. 26(c)(7). To establish confidentiality, a person must establish that the information sought is a trade secret or other proprietary information and then demonstrate that its disclosure might be harmful. *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 131 F.R.D. 668, 671 (S.D.Tex.1990). The burden then shifts to the party seeking discovery to establish that the disclosure is relevant and necessary to the action. *Id.*

It is clear from the Court's *in camera* inspection of the tapes that the representatives of the Mavericks as well as the Committee members intended for their discussions to be kept confidential. Secure in their belief of confidentiality, Mavericks representatives disclosed trade secrets in their negotiations with the Committee, such as financial information, land values, and business plans. The Plaintiffs have not demonstrated that the content of past Committee meetings is necessary to their assertions as to how future Committee meetings should be conducted.

The Court finds that the potential harm to the Mavericks resulting from release of this confidential information outweighs any need by the Plaintiffs to have the confidential information with regard to the injunctive relief they seek. Therefore, the tape recordings at issue will not be released to the Plaintiffs or other members of the public. They will be retained as evidence under seal. Of course, if appeal is taken it will be necessary to release a copy of the tapes to the parties for meaningful appellate review.

*Conclusion*

The Court hereby enjoins the Downtown Sports Development Committee from meeting in closed session with third parties. The Court ORDERS the City to comply with the Texas Open Meetings Act, consistent with this opinion. This preliminary injunction shall remain in effect until the time that a final judgment has been entered on the Texas Open Meetings Act claim or the claim has otherwise has been finally resolved by the parties.

SO ORDERED.