**Jovita CASAREZ, Plaintiff,**

**v.**

**VAL VERDE COUNTY, A Political Subdivision of the State of Texas, and Maria Elena Cardenas, County Clerk of Val Verde County, Defendants.**

**Civil Action No. DR–96–CA–108.**

United States District Court, W.D. Texas, Del Rio Division.

Jan. 24, 1997.

over the offices of Sheriff and County Commissioner of Precinct 1. Were there a magic judicial wand, the Court would require the residents to be reconciled to live in rapprochement rather than be ravaged by rancor. But there is no such scepter. Having listened to the cacophony of claims and counterclaims, the Court will rule on the preliminary injunction issue based on the law and the evidence. *See* FED.R.CIV.P. 52(a); *Landmark Land Co. v. Office of Thrift Supervision,* 990 F.2d 807, 811 (5th Cir.1993).

It is first apropos to say what the issue is not: Whether personnel of the United States military can vote. Clearly, the sacred franchise our armed services protect can be exercised by the protectors. This the Congress has provided, subject to state election laws, in the Federal Post Card Application ("FPCA") law. 42 U.S.C. §§ 1973ff to 1973ff–6.

Alpha Hernandez, Del Rio, TX, David R. Richards, Gray & Becker, Austin, TX, George Joseph Korbel, Texas Rural Legal Aid, San Antonio, TX, for Jovita Casarez.

Ana M. Markowski, County Attorney's Office, Del Rio, TX, for Val Verde County, Maria Elena Cardenas.

Richard F. Gutierrez, Del Rio, TX, Ralph A. Lopez, Lopez, Lotz, Pauerstein & Stahl, San Antonio, TX, Jonathan D. Pauerstein, Lopez, Lotz, Pauerstein & Stahl P.C., San Antonio, TX, for D'Wayne Jernigan.

Thomas Edward Quirk, Quirk & Mansell, P.C., San Antonio, TX, for Murry M. Kachel.

Murry M. Kachel, Del Rio, TX, pro se.

Judith A. Sanders–Castro, San Antonio, TX, Robert Garza, Del Rio, TX, for Oscar Gonzalez, Jr., Frank Coronado.

Javier Aguilar, Special Asst. Attorney General, Austin, TX, for State of Texas.

## ORDER REGARDING ABSTENTION PENDING STATE COURT ACTIONS AND PRELIMINARY INJUNCTION

BIERY, District Judge.

There is tumult in the body politic of Val Verde County, Texas, resulting in a cloud

### THE ISSUES

Instead, the question is: Where legally may mobile minions of military members mark ballots for local offices? For the answer, the federal courts are directed to look to the election law of the state where the controversy arises, in this instance the Texas Election Code and Texas state court interpretation thereof. *See* 42 U.S.C. § 1973ff–6 (each state shall permit person in military or spouse of someone in military who is "otherwise qualified to vote" to use Federal Post Card Application to request absentee ballot); TEX.ELEC.CODE ANN. § 101.001 (Vernon Supp.1997) (person in military or spouse of someone in military is eligible for early voting in Texas if person "is qualified to vote in this state, or if not registered to vote in this state would be qualified if registered"); *Id.* §§ 11.002, 13.001 ("qualified voter" means person is registered to vote and is **resident** of county in which application for registration is made) (emphasis added); *Id.* § 1.015 (Vernon 1986) (a voter's "residence" is "one's home and fixed place of habitation to which he intends to return after any temporary absence"); *Alvarez v. Espinoza,* 844 S.W.2d 238, 247 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.); *Rodriguez v. Thompson,* 542 S.W.2d 480, 483 (Tex.Civ.App.—El Paso

1976, no writ); *Atkinson v. Thomas,* 407 S.W.2d 234, 237–47 (Tex.Civ.App.—Austin 1966, no writ); *Guerra v. Pena,* 406 S.W.2d 769, 776–77 (Tex.Civ.App.—San Antonio 1966, no writ); *McBride v. Cantu,* 143 S.W.2d 126, 127–28 (Tex.Civ.App.—San Antonio 1940, no writ).

In the event votes were improperly allowed in the challenged races, the corollary issues are:

1. Did such impropriety dilute the votes of actual Val Verde county residents and therefore violate the federal Voting Rights Act? 42 U.S.C. § 1973.

2. Do concentrations of improper absentee votes violate constitutional concepts of "one man, one vote"? *See Baker v. Carr,* 369 U.S. 186, 207–08 [82 S.Ct. 691, 704–05, 7 L.Ed.2d 663] (1962). *See also Apple Barrel Prods., Inc. v. Beard,* 730 F.2d 384, 388–89 (5th Cir.1984) (court may consider unpleaded issues raised and argued at preliminary injunction hearing).

## BACKGROUND

Texas has a colorful history of heated, close, and problematic elections. *See e.g.* JOHN E. CLARK, THE FALL OF THE DUKE OF DUVAL (1995); *Alvarez,* 844 S.W.2d at 241; *Rodriguez,* 542 S.W.2d at 482; *Atkinson,* 407 S.W.2d at 237; *Guerra,* 406 S.W.2d at 771–72; *McBride,* 143 S.W.2d at 127. In a good faith effort to ensure access to the laboratory of democracy, the legislative branch passed two statutes which are now juxtaposed for interpretation by the judicial branch:

a) The Federal Post Card Application law (to protect right to vote of uniformed services personnel) (42 U.S.C. § 1973ff–1);

b) The Voting Rights Act (to protect right to vote of those historically denied the same through de jure or de facto action) (H.R.REP. No. 439, 89th Cong., 1st Sess. 6 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2471) (devices used to deny the right to vote because of race or color include stuffing ballot boxes, casting votes for deceased persons, casting multiple ballots, threatening and coercing voters, destroying ballots, willfully miscounting ballots, and buying votes).

Mr. Oscar Gonzalez, Jr. was appointed sheriff to fill the unexpired term of the retired sheriff. Mr. Gonzalez became the Democratic nominee for the next four year term to begin January 1, 1997. Mr. D'Wayne Jernigan became the Republican nominee. For replacement of a retiring county commissioner, Mr. Murry M. Kachel was selected as the Republican nominee and Mr. Frank Coronado was chosen as the Democratic nominee.

The election of November 5, 1996 produced these counts:

*For Sheriff*
D'Wayne Jernigan:   5,373 votes
Oscar Gonzalez, Jr:   5,106 votes
*For County Commissioner Precinct 1*
Murry M. Kachel:   1,266 votes
Frank Coronado:   1,153 votes

Prior to the administration of the oaths of office to Mr. Jernigan and Mr. Kachel, plaintiff Jovita Casarez filed suit in federal court alleging approximately 800 military mail in ballots were improperly allowed to participate in the local, as opposed to federal, elections resulting in a dilution violation of the Voting Rights Act. 42 U.S.C. § 1973. The election in Precinct 1 is of particular import. Laughlin Air Force Base is located in that precinct; almost 500 of the 800 absentee votes in question were cast by persons claiming to be residents of that commissioner's precinct. Plaintiff does not challenge the propriety of the 800 ballots vis-a-vis the federal contests for President, Vice–President, United States Senator, and United States Congress. United States District Judge H.F. Garcia granted a temporary restraining order preventing the assumption of office by Mr. Jernigan and Mr. Kachel until an orderly review of the facts and law could be accomplished.

Pending in state court are two lawsuits related to this matter. Prior to Ms. Casarez filing this federal action, Mr. Gonzalez and Mr. Coronado filed election contests in Val Verde County contending election officials unlawfully allowed the mail in voters to cast ballots and vote in the local elections by the use of the Federal Post Card Application.

Mr. Jernigan, Mr. Kachel, Mr. Gonzalez, and Mr. Coronado have been allowed to intervene.

## ABSTENTION DOCTRINE

"[I]n all cases implicating state/federal relations, federal courts ought to intrude into state affairs no more than is absolutely necessary." *Morrow v. Harwell,* 768 F.2d 619, 628 (5th Cir.1985). A federal court should abstain from deciding cases to avoid needless conflict with a state's administration of its own affairs. *See Burford v. Sun Oil Co.,* 319 U.S. 315, 334, 63 S.Ct. 1098, 1107–08, 87 L.Ed. 1424 (1943). This is especially true in cases involving state voting law issues. "[O]ur federal system contemplates that states will be primarily responsible for regulating their own elections." *Curry v. Baker,* 802 F.2d 1302, 1315 (11th Cir.1986). Even when obvious racial discrimination is at work, voiding the result of a state election is a "drastic, if not staggering (practice), ... and therefore a form of relief to be guardedly exercised." *Bell v. Southwell,* 376 F.2d 659, 662 (5th Cir.1967). Federal courts must not, however, abdicate the decision of federal questions. *Thomas v. Texas State Bd. of Medical Examiners,* 807 F.2d 453, 454 (5th Cir.1987). The issue of abstention may be raised sua sponte by the trial court. *See Barichello v. McDonald,* 98 F.3d 948, 955 (7th Cir.1996).

*Ballas v. Symm,* 494 F.2d 1167 (5th Cir. 1974) is instructive. A college student sought to register to vote in Waller County, Texas. *Id.* at 1168. The County Registrar required the student to complete a "Questionnaire Pertaining to Residence," inquiring into the applicant's address, ownership of property, auto registration, phone listing, and similar matters. *Id.* After completing the questionnaire, the registrar found the student to be a nonresident and denied him the right to vote. *Id.* at 1169.

The student initiated suit in federal court alleging the questionnaire violated the Voting Rights Act under federal law. He also challenged, under Texas statutory law, the registrar's decision he was a nonresident. The trial judge made a threshold determination the questionnaire did not in and of itself violate federal law; the questionnaire did not discriminate based on race because all voters who had moved into the county recently were required to complete the form. *See id.* at 1169, 1171. The student's request for a preliminary injunction was denied. *Id.* at 1170.

The court abstained from immediately taking further action on the case, finding two principles controlling:

(a) avoiding a decision of a federal constitutional question where the case may be disposed of [by] questions of state law, and

(b) avoiding needless conflict with the administration by a state of its own affairs.

*Id.* Characterizing the issue as involving the determination of the student's residency, it opined such a determination was properly one for the state courts under the Texas Election Code. The court reasoned that if the student was declared a resident under state law, his constitutional question would be moot. In affirming the trial court's actions, the Fifth Circuit explained a federal court is not incorrect in taking initial action on a federal question, then abstaining from deciding state election law issues, particularly when the federal voting question may be rendered moot by subsequent proceedings in state court. *See id.* at 1170–72.

As in *Ballas,* plaintiff contends she is entitled to immediate relief because her federal voting rights are subject to violation. This case also raises serious questions of whether the 800 absent voters are legal residents under Texas law. Further, determinations in the state court election contests may moot plaintiff's federal claims; a new election is requested, the same relief sought by the contestors in the pending state litigation. The Court therefore determines abstention on the merits pending judgment in the state court actions is proper.

Intervenor Jernigan moves for dismissal pending determination of the state court proceedings. However, in the interest of "wise judicial administration," federal courts may stay a case involving a question of federal law where a concurrent state action is pending. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483

(1976); *Nakash v. Marciano,* 882 F.2d 1411, 1416 (9th Cir.1989). This ensures the federal forum will remain open if for some reason the state forum proves to be inadequate. *See generally* THE HONORABLE DAVID HITTNER ET AL., RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL § 2:1321.1 (5th Cir. ed. 1996). "Only the clearest of justifications will warrant dismissal." *Colorado River Water Conservation Dist.,* 424 U.S. at 819, 96 S.Ct. at 1247. Here, there are two federal statutes (FPCA and Voting Rights Act) which may need federal court, as opposed to state court, interpretation. Mr. Jernigan's invitation to dismiss is therefore declined.

### STANDARD OF REVIEW REGARDING PRELIMINARY INJUNCTION

■ The purpose of a preliminary injunction is to preserve the status quo pending final determination of the lawsuit. *University of Tex. v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *Collum v. Edwards,* 578 F.2d 110, 112–113 (5th Cir.1978). The decision to grant a preliminary injunction should be treated as the exception rather than the rule. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985); *Calhoun v. USDA Farm Serv. Agency,* 920 F.Supp. 696, 699 (N.D.Miss.1996) (quoting *Cherokee Pump & Equip., Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir.1994)). In order to obtain a preliminary injunction, plaintiff must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the injury to the nonmovant; and (4) the granting of the preliminary injunction will not disserve the public interest. *Rodriguez v. United States,* 66 F.3d 95, 97 (5th Cir.1995) (citing *Canal Auth. v. Callaway,* 489 F.2d 567, 572 (5th Cir. 1974)), *cert. denied,* ―― U.S. ――, 116 S.Ct. 1058, 134 L.Ed.2d 202 (1996); *see Landmark Land Co.,* 990 F.2d at 810. Because a preliminary injunction is considered an extraordinary remedy, the plaintiff's failure to meet her burden on any one of the above listed factors is sufficient for the denial of the issuance of the injunction. *Calhoun,* 920

F.Supp. at 699 (quoting *Cherokee Pump & Equip.,* 38 F.3d at 249). The district court's determination will be reversed only upon a showing of abuse of discretion. *Ingebretsen v. Jackson Public Sch. Dist.,* 88 F.3d 274, 278 (5th Cir.1996), *cert. denied,* ―― U.S. ――, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996).

### THE VOTING RIGHTS ACT

■ Section 2(a) of the Voting Rights Act, as amended, provides:

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color....

42 U.S.C. § 1973(a). A state political subdivision cannot impose any practices or procedures which "result in the denial or abridgment of the right to vote of any citizen who is a member of a protected class of racial and language minorities." *Thornburg v. Gingles,* 478 U.S. 30, 43, 106 S.Ct. 2752, 2762, 92 L.Ed.2d 25 (1986). Section 2(b) provides:

A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973(b). Voting Rights Act legislative history manifests congressional intent that private parties have a right of action to enforce their rights under section 2. S.REP. No. 417, 97th Cong., 2d Sess. 30 (1992), *reprinted in* 1982 U.S.C.C.A.N. 177, 204.

■ Although Congress specifically provided the extent to which members of a protected class have been elected to office is one circumstance that may be considered, nothing in section 2 establishes a right to have members of said class elected in numbers equal to their proportion in the population. *Thornburg,* 478 U.S. at 43, 106 S.Ct. at 2762. The Senate Report accompanying the

1982 amendments to the Voting Rights Act states that inquiry must be made into whether "as a result of the challenged practice or structure[,] plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice...." S.REP. No. 417, *reprinted in* 1982 U.S.C.C.A.N. at 206. Proof of discriminatory intent is no longer required. *Chisom v. Roemer,* 501 U.S. 380, 395, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991). Plaintiff contends the influx of the 800 FPCA votes in the local races, cast by military personnel who are allegedly not residents and have no claim to residence in Val Verde County, resulted in dilution of Hispanic votes and therefore violated section 2 of the Voting Rights Act. *See* 42 U.S.C. 1973; *Thornburg,* 478 U.S. at 43, 106 S.Ct. at 2762.

## TEXAS STATE LAW VOTING REQUIREMENTS

### A. Non–Military Persons Voting in Texas

Texas law sets out the qualifications for a person to vote. Among other things, a person must be eighteen, a United States citizen, a resident of Texas, and registered to vote in Texas. TEX.ELEC.CODE ANN. § 11.002 (Vernon Supp.1997). It is not just registration which qualifies someone to vote in Texas, however. *See id.* A voter must be both "registered" and "qualified" to vote on the day the vote is cast. *Id.* § 11.001 (Vernon 1986). Generally, to be eligible for registration, one must be "a resident of the county in which application for registration is made." *Id.* § 13.001 (Vernon Supp.1997). To be qualified, one must be a "resident" of the "territory covered by the election" at the time he or she there attempts to vote. *Id.* §§ 11.001 (Vernon 1986), 11.002 (Vernon Supp.1997). Even if one is registered to vote, the registration is ineffective if the person has moved to a different county. *See id.* §§ 11.001 (Vernon 1986), 11.002 (Vernon Supp.1997), 13.001 (Vernon Supp.1997).

The statutes provide in relevant part:
Sec. 11.001. Eligibility to Vote

Except as otherwise provided by law, to be eligible to vote in an election in this State, a person must:

(1) be a qualified voter as defined by Section 11.002 on the day a person offers to vote;

(2) be a resident of the territory covered by the election for the office or measure on which the person desires to vote; and

(3) satisfy all other requirements for voting prescribed by law for the particular election.

TEX.ELEC.CODE ANN. § 11.001 (Vernon 1986).

Sec. 11.002. Qualified Voter

In this code, "qualified voter" means a person who:

(1) is 18 years of age or older;

(2) is a United States citizen;

. . . .

(5) is a **resident** of this State; and

(6) is a registered voter.

TEX.ELEC.CODE ANN. § 11.002 (Vernon Supp. 1997) (emphasis added).

Sec. 13.001. Eligibility; Manner of Applying for Registration

(a) To be eligible for registration as a voter in this State, a person must:

(1) be 18 years of age or older;

(2) be a United States citizen;

. . . .

(5) be a **resident** of the county in which application for registration is made....

TEX.ELEC.CODE ANN. § 13.001 (Vernon Supp. 1997) (emphasis added).

### B. Military Persons Voting in Texas

Texas election law has a special provision for absentee voting by military persons and their dependents. TEX.ELEC.CODE ANN. § 101.001 (Vernon Supp.1997). Instead of being both qualified and registered, a military voter requesting an absentee ballot need only be qualified to vote. *Id.* Texas law provides that such persons be qualified to vote, and **either** registered to vote in Texas or qualified to vote, if not registered. *Id.* (emphasis added). Thus, a military voter need not be registered in Texas, but he or she must be a legal resident of the voting precinct in which the military voter seeks to vote. *See id.* §§ 101.001 (Vernon Supp.1997), 11.001 (Vernon 1986), 11.002 (Vernon Supp.

1997), 13.001 (Vernon Supp.1997). If a military voter is registered to vote in Val Verde County, then the FPCA request operates as a request for an absentee ballot. *See* TEX. ELEC.CODE ANN. § 101.003 (Vernon Supp. 1997). If the person is not registered to vote in Val Verde County, but would be qualified to vote if registered, the federal application operates as a temporary voter registration for the election in question. *See id.*

Section 101.001 of the Texas Election Code, relating to the use of the FPCA, provides:

Sec. 101.001. Eligibility

A person is eligible for early voting by mail as provided by this chapter, if:

(1) the person is qualified to vote in this state or, if not registered to vote in this state, would be qualified if registered; and

(2) the person is:

(A) a member of the armed forces of the United States, or the spouse or a dependent of a member; . . . .

TEX.ELEC.CODE ANN. § 101.001 (Vernon Supp.1997).

Sec. 101.003. Forms and Contents of Application

(a) An application for a ballot to be voted under this chapter must:

(1) be submitted on an official federal postcard application form; and

(2) include the information necessary to indicate that the applicant is eligible to vote in the election for which the ballot is requested.

(b) In this chapter, "federal postcard application" means an application for a ballot to be voted under this chapter submitted on the official federal form prescribed under the Federal Voting Assistance Act of 1955.

TEX.ELEC.CODE ANN. § 101.003 (Vernon Supp.1997).

## *FEDERAL LAW APPLYING TO VOTERS IN THE MILITARY*

The Uniformed and Overseas Citizens Absentee Voting Act (sometimes referred to as "the Act"), or the FPCA law, is codified at 42 U.S.C. §§ 1973ff to 1973ff–6. The statute applies only to military personnel voting for **federal** office and then only if the voter relying on it "is otherwise qualified to vote" in the state. 42 U.S.C. §§ 1973ff–1, 1973ff–5 (emphasis added). The Act provides as follows:

Sec. 1973ff–1. State Responsibilities

Each state shall—

(1) permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for **Federal** office;

(2) accept and process, with respect to any general, special, primary, or runoff election for **Federal** office, any otherwise valid voter registration application from an absent uniformed services voter or overseas voter, if the application is received by the appropriate State election official not less than 30 days before the election; and

(3) permit overseas voters to use **Federal** write-in absentee ballots . . . in general elections for **Federal** office.

42 U.S.C. § 1973ff–1 (emphasis added).

Sec. 1973ff–6. Definitions

As used in this subchapter, the term

(1) "absent uniformed services voter" means—

(A) a member of a uniformed service on active duty who, by reason of such active duty, is absent from the place of residence where the member is otherwise qualified to vote;

(B) a member of the merchant marine who, by reason of service in the merchant marine, is absent from the place of residence where the member is otherwise qualified to vote; and

(C) a spouse or dependent of a member referred to in subparagraph (A) or (B), who, by reason of the active duty or service of the member, is absent from the place or residence where the spouse or dependent is otherwise qualified to vote;

(3) **"Federal office" means the office of President or Vice President, or of Senator or Representative in, or Dele-**

gate or **Resident Commissioner to, the Congress;** ....

42 U.S.C. § 1973ff–6 (emphasis added).

In summary, pursuant to Texas and federal statutory voting law, merely being in the military and having been stationed in Val Verde County at Laughlin Air Force Base does not confer the right to vote in Val Verde County forever. The FPCA law does not create the right to vote; it only mandates that states provide procedures simplifying the way a person who is in the military and is "otherwise qualified to vote" may request a ballot and vote absentee. *Id.* § 1973ff–6(1)(B). The person's legal residence determines whether the individual may vote for federal office only or both local and federal officials.

### SUPREME COURT PRECEDENT

The United States Supreme Court has also indicated a member of the military is on the same footing as any other person who seeks to vote in Texas. In *Evans v. Cornman*, 398 U.S. 419, 421–22, 90 S.Ct. 1752, 1754–55, 26 L.Ed.2d 370 (1970), the Court relied upon *Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), to hold that persons who live within the geographical boundaries of a state, and are treated for all other purposes as if they were state residents, may not be prohibited from voting solely because they reside on a federal reservation. The Court pointed out, however:

> Maryland may, of course, require that "all applicants for the vote actually fulfill the requirements of bona fide residence." *Carrington v. Rash*, 380 U.S. 89, 96 [85 S.Ct. 775, 780, 13 L.Ed.2d 675] (1965). "But if they are in fact residents, with the intention of making [the state of Maryland] their home indefinitely, they, as all other qualified residents, have a right to any equal opportunity for political representation." *Id.* at 94.

*Evans*, 398 U.S. at 421, 90 S.Ct. at 1754.

In *Carrington*, the Court considered the federal constitutionality of Texas constitutional and statutory provisions which created an irrebuttable presumption that members of the military could not vote in Texas elections. 380 U.S. at 90, 85 S.Ct. at 777. Article VI, Section 2, of the Texas Constitution in 1964 provided:

> Any member of the Armed forces of the United States or component branches thereof, or in the military service of the United States, may vote only in the county in which he or she resided at the time of entering such service so long as he or she is a member of the Armed Forces.

*Id.* at n. 1 Sergeant Carrington filed a writ of mandamus to compel the El Paso Republican County Chairman to determine whether the sergeant was a qualified elector for the purpose of voting in the May 2, 1964 Republican Primary. *See id.* The record demonstrated Sergeant Carrington had resided in El Paso for many years, intended to make it his home permanently, lived in a house which he owned with a wife and children, paid property taxes in Texas, had his automobile licensed in Texas, and was the proprietor of a small business in El Paso. *Id.* at 91, 85 S.Ct. at 777. "But for his uniform," the State conceded Sergeant Carrington was eligible to vote in El Paso County, Texas. Texas defended its restriction on voting by members of the military by arguing it had "a legitimate interest in immunizing its elections from the concentrated balloting of military personnel, whose collective voice may overwhelm a small local civilian community." *Id.* at 93, 85 S.Ct. at 778.

■ The Supreme Court acknowledged "protecting the franchise from infiltration by [persons who] will be within the state for only a short period of time" is a valid exercise of Texas' state power, but refused to allow the absolute prohibition against voting by anyone in the military.

> We stress—and this is a to be theme reiterated—that Texas has the right to require that all military personnel enrolled to vote be **bona fide residents** of the community. But, if they are in fact residents, with the intention of making Texas their home indefinitely, they, as all other qualified residents, have a right to an equal opportunity for political representation.

*Carrington*, 380 U.S. at 93–94, 85 S.Ct. at 779 (emphasis added). It was explained:

We recognize that special problems may be involved in determining whether servicemen have actually acquired a new domicile in a State for franchise purposes. We emphasize that Texas is free to take reasonable and adequate steps, as have other states, to see that all applicants for the vote actually fulfill the **requirements of bona fide residence.**

*Id.* at 96, 85 S.Ct. at 780 (emphasis added) (footnote omitted). Reading *Evans* and *Carrington* together with Texas state election law and the federal postcard statutes, the law is settled that service members may vote in Texas local elections only if they are residents of the county in which the vote is cast.

## TEXAS RESIDENCY REQUIREMENTS

### A. The Texas Election Code

The Texas Election Code describes residency and qualification to vote:

Sec. 1.015. Residence

(a) In this code, "residence" means domicile, that is one's home and fixed place of habitation to which he intends to return after any temporary absence.

(b) Residence shall be determined in accordance with the common-law rules, as enunciated by the courts of this state, except as otherwise provided by this code.

(c) A person does not lose his residence by leaving his home to go to another place for temporary purpose only.

(d) A person does not acquire a residence in a place to which he has come for temporary purposes only and without the intention of making that place his home....

TEX.ELEC.CODE ANN. § 1.015 (Vernon 1986).

Sec. 1.005. Definitions

In this code:

. . . .

(16) "Registered voter" means a person registered to vote in this state whose registration is effective.

(17) "Residence address" means the street address and any apartment number, or the address at which mail is received if the residence has no address, and the city,

state, and zip code that corresponds to a person's residence....

TEX.ELEC.CODE ANN. § 1.005 (Vernon 1986).

### B. Texas Case Law

In order to qualify as a resident, the person must demonstrate ties to the community. The San Antonio Court of Appeals referred to this as a "presence" for the purpose of voting:

The supreme court has stated that "volition, intention and action" are "equally pertinent" elements to consider. "Neither bodily presence alone nor intention alone will suffice to create the residence, but when the two coincide at that moment the residence is fixed and determined." *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex.1964). Thus, under the statute the election officials are to focus on the voter's "home and fixed place of habitation." Intention and presence are important evidentiary factors, and a temporary move from one place to another will neither create a new residence nor lose an old one. In assessing presence, the cases have considered such conduct as where the voter sleeps and keeps clothes and furniture, and the length of time spent in the alleged residence.

*Alvarez v. Espinoza*, 844 S.W.2d 238, 247 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.) (citation omitted). Specific examples of conduct which the Texas courts have found relevant to assessing presence are:

* Air Force Captain, although stationed in another state, owned no property there, continued to vote in county, and regularly stayed with his wife's parents while on furlough. *Rodriguez v. Thompson*, 542 S.W.2d 480, 484 (Tex.Civ.App.—El Paso 1976, no writ);

* Air Force Captain's wife grew-up in county, lived with her parents there while her husband was stationed overseas, and continued to vote in county. *Id.* at 484–85;

* The voter was registered with the county draft board and called to service by it, and after returning from the Army, the voter practiced law in the county, filed his income tax from there, and was twice a delegate from the county to the State

Democratic Convention. *Atkinson v. Thomas,* 407 S.W.2d 234, 239 (Tex.Civ. App.—Austin 1966, no writ);

* The voter sleeps and keeps clothes and furniture at a certain location. *Alvarez,* 844 S.W.2d at 247;

* The voter receives mail at a certain location. *Id.; Atkinson,* 407 S.W.2d at 239;

* The voter spends a considerable amount of time at one place. *Alvarez,* 844 S.W.2d at 247;

* The voter claims a location as his permanent residence. *Id.;*

* Testimony the voter intends to return to the precinct to live when he can find a house there. *Id.;*

* The voter is a full time college student, his mother still lives within the district, and he comes home for summers and spring breaks. *Alvarez,* 844 S.W.2d at 247;

* One works elsewhere only seasonally, spends about half of each year at a house in the precinct, and still has furniture and clothes in this house. *Guerra v. Pena,* 406 S.W.2d 769, 777 (Tex.Civ. App.—San Antonio 1966, no writ);

* The voter maintains a bank account and a car registration and owns a house in the precinct which he declared to be his homestead. *Rodriguez,* 542 S.W.2d at 483.

* The voter and her husband claim the county where they own a furnished home as their residence, and testify another county is not and has not been their home; when their children finished school they stated they would come back to their home in the county, they paid taxes in the county, and further stated they voted in every election for about twenty-four years in the county before moving to simplify the education of the children and had not voted elsewhere. *McBride v. Cantu,* 143 S.W.2d 126, 127–28 (Tex.Civ.App.—San Antonio 1940, no writ);

* Each of the migrant worker voters maintained a permanent residence in one of the precincts and was gone only a part of the year because of his work. *Guerra,* 406 S.W.2d at 776;

* The voter was working in another county while seeking employment in the county where he lived. *Id.* at 776–77.

* The voter worked four or five months for a construction company in another state. *Id.* at 777;

* The voter was temporarily out of the county nursing her sick husband. *Id.*

Each of these cases looked to family ties, economic relationship, frequent return, property ownership, physical presence, and other indicia as indication of "presence."

■ One of the key factors in determining the residence of a voter is the length of time one has been absent from the place in which one seeks to vote. When a voter is absent from the community, an intent to return alone will not suffice to create residency. *Slusher v. Streater,* 896 S.W.2d 239, 246 (Tex. App.—Houston [1st Dist.] 1995, no writ). The intent must be coupled with other evidence that such intent is "bona fide." *See Carrington,* 380 U.S. at 96, 85 S.Ct. at 780. For example, the temporary absences cited by the court in *Guerra v. Pena,* 406 S.W.2d at 776–77, did not destroy residency because of additional evidence the voters had maintained homes or rented rooms in the county, and all kept furniture or clothes in their county residences. A minister was not a resident of the county because he had resigned his position, was currently a minister in another county, and there was no evidence he intended to return to his former county after he resigned. *Clark v. Stubbs,* 131 S.W.2d 663, 666–67 (Tex.Civ.App.—Austin 1939, no writ). An absent husband and wife do not remain residents of a community unless additional evidence exists which demonstrates an intent to return:

Mrs. Rutledge left Loving County and went to San Angelo almost a year before the election . . . she rented a house there. Mr. Rutledge left [four months before the election] and . . . leased a place in Irion County from his mother for . . . three years and was living there with his family at the time of the election. . . . [Mr.] Rutledge and his wife [conceded that they] had lived in two other counties after leaving

Loving County ... [and that] the house in which they had lived ... had been sold. These facts, we think clearly justified the trial court in concluding that they had [abandoned their residency] notwithstanding the expressed intention to return to Loving County.

*Stratton v. Hall,* 90 S.W.2d 865, 866 (Tex.Civ. App.—El Paso 1936, writ dism'd). Even if a voter owns property in the county, has relatives there, and returns on a bi-weekly basis, if he or she is gone for a significant period of time, voting residence is lost.

Although [the voter] owns a house in Hebbronville, which is occupied by his mother, [the voter] rents another house in Corpus Christi where he sleeps from Sunday through Friday nights of every week and has continuously done so [for approximately fourteen years]. He returns to Hebbronville about every weekend or two and has always voted in Hebbronville.... [T]he trial court erred in holding he was a resident of precinct 1.

*Zuniga v. Almaraz,* 514 S.W.2d 331, 334–35 (Tex.Civ.App.—San Antonio 1974, no writ); *see also McBride v. Cantu,* 143 S.W.2d 126, 128 (Tex.Civ.App.—San Antonio 1940, no writ) ("She also testified that she and her husband claim Brooks County, where they own a furnished home, as their residence and that Mission is not and has not been their home; that her husband's work with the Sun Oil Company is temporary, and when it is finished, she and her husband intend to return to their home in Brooks County.").

Moreover, a review of Texas case law demonstrates a legitimate intent to return is decreased each year the person remains away.

* "[I]t cannot be seriously argued that precinct three is their 'home or fixed place of habitation' under § 1.015 [where they have been absent for three years.] Although they may satisfy the intent element of the test for residence, their presence in the district is, as a matter of law, too attenuated." *Alvarez v. Espinoza,* 844 S.W.2d 238, 248 (Tex.App.— San Antonio 1992, writ dism'd w.o.j.);

* "[Voter has] resided for four years [in another city]. From this perspective,

her presence there is more than just temporary." *Slusher v. Streater,* 896 S.W.2d 239, 246 (Tex.App.—Houston [1st Dist.] 1995, no writ);

* Although registered in Presidio County, voter who "lived in Dallas for 'three years is not a resident of [the] county." *Rodriguez v. Thompson,* 542 S.W.2d 480, 486 (Tex.Civ.App.—El Paso 1976, no writ).

Clearly, these state law examples of three or four year absences must be harmonized with the reality that military careers span twenty to thirty years and usually involve multiple moves. Thus it would be possible for military members who have been absent from Val Verde County for many years to prove they are nevertheless bona fide residents if they can prove the appropriate intent plus other ties to Val Verde County. But Mr. Jernigan and Mr. Kachel, who wish to have the absentee military votes counted, have presented little or no evidence of the bona fides or the ties to Val Verde County of the undisputedly absent voters.

## DISCUSSION

### *Likelihood of Success on the Merits*

To obtain a preliminary injunction, a plaintiff must show she is likely to prevail on the merits of her claim. *Rodriguez,* 66 F.3d at 97. The likelihood of success need not be one of absolute certainty, however. *Sebastian v. Texas Dept. of Corrections,* 541 F.Supp. 970, 975 (S.D.Tex.1982). The movant is not required to prove her case. *Lakedreams v. Taylor,* 932 F.2d 1103, 1109 n. 11 (5th Cir.1991). Nor is it "necessary that the [movant's] right to a final decision, after a trial, be absolutely certain [or] wholly without doubt." *Sebastian,* 541 F.Supp. at 975 (citing *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953)). A reasonable probability of success, not an overwhelming likelihood, is all that need be shown for preliminary injunctive relief. *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir.1991). A preliminary injunction may issue if plaintiff has raised questions going to the merits so serious and substantial as to make them fair ground for litigation and thus

for more deliberate investigation. *Finlan v. City of Dallas*, 888 F.Supp. 779, 791 (N.D.Tex.1995); *Cho v. Itco, Inc.*, 782 F.Supp. 1183, 1185 (E.D.Tex.1991); *Sebastian*, 541 F.Supp. at 975. Here, it must first be determined whether plaintiff has raised questions sufficient to meet the test of substantial likelihood of success on her claim the FPCA ballots should not have been counted in the local races because these voters failed to meet the residency requirements. If proven, it must next be determined whether plaintiff has presented sufficient likelihood of success to merit preliminary injunctive relief on her section 2 Voting Rights Act claim.

### 1. Evidence of Residency

Plaintiff obtained a copy of all of the approximately 800 FPCA applications in question and subjected them to analysis. As set forth below, these studies were summarized in the affidavits of Mr. Nolberto Frausto and Mr. Eloy Padilla:

* Each of the voters requested an absentee ballot using the Federal Post Card Application;
* None of the approximately 800 persons who filed a FPCA application to vote absentee in the November 5, 1996 Val Verde County general election were living in the county at the time of the election.

The third question on the FPCA is "voting residence." The definitions section which the military supplies to persons who want to vote using the FPCA application defines "voting residence" as the voter's "domicile generally." 96–97 Voting Assistance Guide to Uniformed and Overseas Citizen Absentee Voting Act, pages 303–304, 42 U.S.C. 1973FF, DOD Gen–6Q/DA PAM 360–503/NAVPERS 15562/AFP 211–4/NAVMC 1174 (Rev.95)/COMDTINST MI1742.2C. It then defines domicile as "voting residence."

The place where a person has a true, fixed, and permanent home or ties and to which whenever absent, has the intention of re-turning. It is the address that generally ties the voter into the precinct in which the voter intends to vote.

*Id.*

Plaintiff's analysis showed a total of 589 of the 800 (73.6%) FPCA absentee voters answered the voting residence question. The other 211 did not answer the question, but still received a full ballot. Clearly, there is a question of whether the County Clerk should have sent the ballot to these individuals. The actual questionnaire does not comply with the federal regulation quoted above, nor with the residency requirements of section 1.015 of the Texas Election Code, in that it does not inform military voters they must intend to return and have ties to the location. *See Appendix* (Texas FPCA form); *see also* TEX.ELEC.CODE ANN. § 1.015 (Vernon 1986). According to plaintiff, the last dates of residency in Val Verde County ranged from a few months up to more than 25 years. Based upon the response to this question, plaintiff determined approximately:

* 457 of the FPCA absentee voters last resided in Val Verde County more than 4 years ago;
* 399 of the FPCA absentee voters last resided in Val Verde County more than 5 years ago;
* 345 of the FPCA absentee voters last resided in Val Verde County more than 6 years ago;
* 313 of the FPCA absentee voters last resided in Val Verde County more than 7 years ago;
* 266 of the FPCA absentee voters last resided in Val Verde County more than 8 years ago;
* 227 of the FPCA absentee voters last resided in Val Verde County more than 9 years ago;
* 203 of the FPCA absentee voters last resided in Val Verde County more than 10 years ago.[1]

---

1. The actual count from the 587 who responded to this question was: 337 admitted that they last resided in Val Verde County more than 4 years ago. 294 admitted that they last resided in Val Verde County more than 5 years ago. 254 admitted that they last resided in Val Verde County more than 6 years ago. 231 admitted that they last resided in Val Verde County more than 7 years ago. 196 admitted that they last resided in Val Verde County more than 8 years ago. 167 admitted that they last resided in Val Verde County more than 9 years ago. 150 admitted

Plaintiff next determined approximately 430 of the FPCA applications contained incomplete or inaccurate information demonstrating the applicant was not qualified to vote. Mr. Frausto testified:

* 340 of the applicants either provided an inaccurate zip code or had no zip code at all.
  * A total of 307 in this category claimed to reside in Commissioner's Precinct 1.
* 93 of the applications listed no street address for the permanent voting residence which they claimed in Val Verde County.
  * 89 of these claimed to reside in Commissioner's Precinct 1.
* 49 of the applications referred to a building but provided no street address for that building.
  * All of these claimed to reside in Commissioner's Precinct 1.
* 51 of the applications provided a street address for a multi family unit without specifying the apartment number which they claimed as a residence.
  * 33 of these claimed to reside in Commissioner's Precinct 1.
* 17 of the applications, all located in Commissioner's Precinct 1, listed an address of a building which apparently which apparently does not exist or which has not been used as a residence for many years.

The Frausto affidavit also notes almost one hundred (100) of the FPCA applicants indicated they had last voted in another state. At the hearing on the motion for preliminary injunction, plaintiff presented additional results of her investigation, only a few examples of which are summarized below:

* Voter was born in 1970 in Honolulu, Hawaii, but currently lives in Cheyenne, Wyoming. His last day of residence in Val Verde County was March 2, 1995, and he has not returned since. The voter did not register to vote in Val Verde County, and last voted in Honolulu in 1992. He owns no property in Val Verde County, and is licensed to drive in Hawaii.

* Military voter and his spouse currently live in Colorado Springs, Colorado. Their last day of residence in Val Verde County was March 15, 1996. The wife stated she and her husband intend to return to Texas, but to Austin or San Antonio, not Val Verde County.

* Voter last voted in Val Verde in 1986, and his last day of residence there was September 1991. He lives in Florida, and owns a home which has been designated as his "homestead" under that state's law.

* Military voter lives in Fairborn, Ohio, and his last day of residence in Val Verde County was October 3, 1988. His wife voted in Ohio, and they have no property or accounts in Val Verde County.

* Military voter lives in Idaho and his last day of residence in Val Verde County was October 31, 1992. He did not register to vote when in the county and states he intends to return only to visit family in Austin, Texas.

* Military voter and his spouse live in Bexar County, Texas. He and his wife were married twenty-six ago and spent their honeymoon in Val Verde County at his wife's grandmother's home. The husband has never been stationed at Laughlin Air Force Base.

* Other examples include instances where it appears one out of state spouse was registered to vote where the couple physically lives and the other sought to vote in Val Verde County.

* Instances where absent voters apparently realized on their own that they had no connection to Val Verde County and wanted only to vote in the federal elections, but were nevertheless sent a local ballot as well.

Defendants and intervenors presented no rebuttal evidence in response to plaintiff's analysis of the FPCA votes. *See Federal Sav. & Loan Ins. Corp. v. Dixon,* 835 F.2d 554, 566 (5th Cir.1987) (trial court did not err in granting preliminary injunction and finding plaintiff had established likelihood of success on merits where defendants offered no

that they last resided in Val Verde County more than 10 years ago.

evidence to rebut plaintiff's case against them); *Luckette v. Lewis,* 883 F.Supp. 471, 477–78 (D.Ariz.1995) (plaintiff properly established substantial likelihood of success in absence of rebuttal evidence from defendant); *Hicks v. Dothan City Bd. of Educ.,* 814 F.Supp. 1044, 1048–49 (M.D.Ala.1993) (preliminary injunction issued upon plaintiff presenting sufficient evidence as to merits of claim and in absence of controverting evidence from defendant); *D'Amico v. New York State Bd. of Law Examiners,* 813 F.Supp. 217, 220, 223 (W.D.N.Y.1993) (plaintiff established sufficient likelihood of success to warrant preliminary injunction absent rebuttal evidence from defendant); *Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1362 (W.D.Pa.1977) (in absence of controverting evidence, plaintiff established substantial likelihood of success).

Defendants maintain, without citation to statutory authority or case law, the Val Verde County Clerk was not responsible for making a residency determination as to the FPCA voters. The Texas Election Code, however, indicates the County Clerk is responsible for making this determination. *See* TEX.ELEC.CODE ANN. § 101.003 (Vernon Supp.1997) (application for FPCA ballot must include information necessary to indicate applicant is eligible to vote in county election); *Id.* § 87.041 (early voting ballot board shall determine whether to accept voter's ballot). Moreover, at the hearing on the motion for preliminary injunction, Ann McGeehan, Deputy Assistant to the Secretary of State, testified this is the proper interpretation of Texas law.

■ The Court determines plaintiff has raised questions sufficient to meet the test of substantial likelihood of success on her claim the FPCA ballots should not have been counted in Val Verde County local races because the voters failed to meet Texas residency requirements. *Finlan,* 888 F.Supp. at 791; *Cho,* 782 F.Supp. at 1185; *Sebastian,* 541 F.Supp. at 975. The record is replete with examples of FPCA voters who, at least for preliminary injunctive purposes, have no intent or evidence of indicia of intent to return to Val Verde County.

## 2. Evidence of a Voting Rights Violation

Plaintiff contends she has presented evidence raising serious and substantial questions as to whether the influx of these alleged improper votes in the local races resulted in the dilution of the Hispanic vote which resulted in a violation of section 2 of the Voting Rights Act. 42 U.S.C. § 1973. The United States Supreme Court has identified a three part test to determine whether a voting procedure dilutes minority voting strength and therefore violates section 2. *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986). The minority group must demonstrate it is: (1) "large and geographically compact"; (2) "politically cohesive"; and (3) the non-minority "votes sufficiently as a block to enable it ... to defeat the minority's preferred candidate." *Id.* In this preliminary injunction proceeding, plaintiff Casarez must raise serious and substantial questions as to whether Hispanics in Val Verde County are: (1) large and geographically compact; (2) politically cohesive; and (3) the non-Hispanic majority voted sufficiently as a block to enable it to defeat Mr. Gonzalez and Mr. Coronado. *See id.*

### First Prong of Gingles

It is not contested there are large geographical areas where Hispanics comprise virtually all of the population in Val Verde County. Plaintiff submitted the affidavit of Dr. Henry Flores showing Hispanics are generally concentrated in the virtually all-Hispanic San Felipe and Chihuahua neighborhoods in Del Rio. Intervenor Jernigan submitted evidence showing that out of the 19,972 eligible voters in Val Verde County, 12,177 are Hispanic. *See Campos v. City of Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989) (Hispanic population in Texas community sufficiently large and geographically compact to satisfy first prong of *Gingles* test). The first prong of *Gingles* has been met. 478 U.S. at 51–51, 106 S.Ct. at 2766–67.

### Second and Third Prongs of Gingles

To establish the second prong of the *Gingles* test, plaintiff must raise serious and

substantial questions as to whether Hispanics in Val Verde County generally vote together. 478 U.S. at 51, 106 S.Ct. at 2766. Ordinarily, minority voter cohesion is established through evidence of racially polarized voting. *Clark v. Calhoun County,* 21 F.3d 92, 96 (5th Cir.1994). Racial polarization exists where there is a consistent relationship between the race of the voter and the manner in which the voter votes. *Gingles,* 478 U.S. at 54, 106 S.Ct. at 2768. This occurs when race is a predominant factor and influence in voter choice. *Id.; see also Houston v. Lafayette County,* 56 F.3d 606, 609 n. 1 (5th Cir.1995). The third and final prong of the *Gingles* test—the non-Hispanic majority is large enough and votes sufficiently to defeat minority preferred candidates—also relies on an examination of elections for the existence of racially polarized voting. *Clark,* 21 F.3d at 96.[2]

## A. Analysis of the Vote in Commissioner's Precinct 1

Plaintiff alleges the degree of racial polarization in the November 1996 general election is clear from an analysis of the election in Commissioner's Precinct 1 which covers Val Verde County voting precincts 9, 10, 11, and 20. It is undisputed voting precincts 9, 10 and 11 are comprised of heavily Hispanic neighborhoods located in the "San Felipe area" of Del Rio—generally in the area of

the old San Felipe High School. Precinct 20 is Laughlin Air Force Base.

Plaintiff sets forth the results of the election below:

| Voting Precinct | Election Day Kachel | Absentee[3] Kachel | Total Kachel |
|---|---|---|---|
| 9 | 142 | 149 | 291 (41.4%) |
| 10 | 89 | 99 | 188 (34.2%) |
| 11 | 23 | 22 | 45 (13.9%) |
| 20 | 275 | 467 | 742 (88.1%) |
| Total | 529 | 737 | 1,266 (52.3%) |

| Voting Precinct | Election Day Coronado | Absentee Coronado | Total Coronado |
|---|---|---|---|
| 9 | 225 | 187 | 412 (56.6%) |
| 10 | 218 | 144 | 362 (65.8%) |
| 11 | 187 | 92 | 279 (86.1%) |
| 20 | 44 | 56 | 100 (11.9%) |
| Total | 674 | 479 | 1,153 (47.7%) |

The voting precinct and the number of federal postcard votes counted are summarized in column form below:

| Voting Precinct | Federal Postcard Votes[4] |
|---|---|
| 9 | 12 |
| 10 | 4 |
| 11 | 3 |
| 20 | 441 |
| Total | 460 |

Plaintiff's Exhibits 6, 7, 8, and 9 are graphic renderings of the results of the election in the four voting precincts comprising Commissioner's Precinct 1. In support of his motion for preliminary injunction, plaintiff presented the following evidence that Hispanic voters and Anglo voters voted differently in the race for Commissioner's Precinct 1:

2. The Appendix contains plaintiff's Exhibits 6, 7, 8, 9, and 10, which are graphic renderings of the results of the challenged elections in Val Verde County.

3. Note that "absentee" as used in this context includes what is now referred to as "early in person voting," regular absentee by mail—the

traditional state procedures and "FPCA" voting. Unfortunately the vote totals by candidate are not broken down by these categories. However, actual numbers in each category are contained in Exhibit 11. The four voting precincts in Commissioner's Precinct 1 have breakdowns by classification as follows:

| Precinct | Election Day | Early Voting Personal Appearance | FPCA Ballots | Absentee by Regular Mail |
|---|---|---|---|---|
| 9 | 387 | 323 | 12 | 37 |
| 10 | 321 | 221 | 4 | 41 |
| 11 | 221 | 104 | 3 | 17 |
| 20 | 335 | 133 | 441 | 14 |
| Total | 1,264 | 781 | 460 | 109 |

4. The FPCA votes are all absentee and are included in the absentee totals for the respective candidates. Nevertheless, these totals are included to show the extreme concentration of FPCA absentee votes in voting precinct 20 which

accounts for more than 95% of the Federal Post Card Absentee votes which were cast in Commissioner's Precinct 1.

* Mr. Coronado carried the heavily Hispanic precincts 9, 10 and 11 by margins of three to two, two to one, and six to one respectively, but lost the predominately Anglo voting precinct 20 by a margin of almost eight to one.

* Mr. Coronado defeated Mr. Kachel by 145 votes on election day (674 to 529). However, Mr. Kachel defeated Mr. Coronado by 298 votes among absentee ballots (737 to 479).

* There were a total of 523 votes cast absentee in voting precinct 20. Of these 85.3%, were the result of a Federal Post Card Application. Mr. Kachel led Mr. Coronado by a margin of almost 9 to 1 (457 to 56) in the precinct 20 absentee votes.

* Voting Precinct 20 produced just over one third of the total votes cast in Commissioner's Precinct 1 but Mr. Kachel received almost two thirds of his total vote from that precinct.

* There were a total of 466 Federal Post Card votes cast in Commissioner's Precinct 1.

* Voting Precinct 20 produced 446 or 95.7% of the total FPCA absentee votes cast in Commissioner's Precinct 1.

In the graphic identified as Exhibit 6, the percent of the vote for Mr. Coronado is shown by a solid line and the percent of the Spanish Surnamed Registered voters in each voting precinct in Commissioner's Precinct 1 is shown by a series of bars. In the graph described as Exhibit 7, the percent of the vote for Mr. Coronado and also for Mr. Gonzalez is shown by solid lines and the percent of the Spanish Surnamed Registered voters in each voting precinct in Commissioner's Precinct One is shown by a series of bars. In the graph identified as Exhibit 8, the percent of the vote for Mr. Kachel is shown by a dotted line and the percent of the Registered voters who are not Spanish Surnamed in each voting precinct in Commissioner's Precinct 1 is shown by a series of bars. In the graph identified as Exhibit 9, the percent of the vote for Mr. Kachel and Mr. Jernigan, the Anglo candidate for Sheriff, are shown by a dotted line and the percent of the registered voters who are not Spanish Surnamed in each precinct is shown by a series of bars. Based on these Exhibits, plaintiff contends there is a high degree of correlation between the vote for Mr. Coronado and the vote for Mr. Gonzalez as well as with percent of Spanish Surnamed Registered Voters in each voting precinct. It is further contended there is a high degree of correlation between the vote for Mr. Kachel and in the percent of Anglo or White registered voters in each precinct. Plaintiff further points out that Dr. Flores computed the extent of this correlation and describes it as extreme racial polarization. A complete precinct breakdown of the election as contemplated by plaintiff is illustrated in Exhibit 10.

### B. Analysis of Votes for Sheriff

Mr. Jernigan defeated the incumbent Sheriff Oscar Gonzalez by a total of 267 votes. Mr. Gonzalez carried the heavily Hispanic voting precincts with margins ranging upwards of two and three to one while losing the heavily Anglo precincts by margins of up to five to one. The precinct by precinct returns for this race are illustrated in Exhibit 10.

A graph depicting the percentage of the vote received by Mr. Gonzalez and the percent of the vote received by Mr. Coronado is illustrated in Exhibit 8. Plaintiff points out that the percentage of the vote cast for Mr. Gonzalez closely parallels the votes cast for Mr. Coronado in the heavily Hispanic Commissioner's Precinct 1 and the percentage of Hispanic registered voters in the respective precincts.

Dr. Flores prepared statistical analysis of this race and concluded that there is evidence of extreme polarization. In general, his analysis finds:

* Mr. Gonzalez carried the heavily Hispanic Precincts 1, 5, 9, 10, 11, 12 and 13 by margins of up to two and three to one, but lost the predominately Anglo voting Precincts 3, 6, 7, 8, 14, 18 and 20 by up to five to one;

* Mr. Gonzalez defeated Mr. Jernigan by 33 votes on election day (2,885 to 2,918). However, Mr. Jernigan defeated Mr.

Gonzales by 300 votes among absentee ballots (2,488 to 2,188);

\* There were a total of 515 votes cast absentee in voting Precinct 20. Of these 446 or approximately 85% were the result of a Federal Post Card Application. Mr. Jernigan defeated Mr. Gonzalez by a margin of more than 5 to 1 (430 to 85) in the Precinct 20 absentee votes;

\* There were a total of approximately 800 Federal Post Card Application absentee votes cast county wide. Voting Precincts 2, 3, 14 and 20 produced 740 or 92.5% of the total Federal Post Card Absentee Votes. In those precincts, Mr. Jernigan defeated Mr. Gonzalez among absentee voters by a margin of almost 800 votes (1,424 to 639).

### The Meaning of These Numbers

Plaintiff alleges the evidence indicates Hispanic voters overwhelmingly support the candidates of their choice while Anglo voters vote just as substantially for different candidates. Plaintiff further argues the evidence demonstrates the choices of the Hispanic community are Mr. Gonzalez and Mr. Coronado; plaintiff argues the approximately 800 FPCA voters were virtually all Anglo and appear to have voted overwhelmingly for the Anglo candidates. Without these FPCA voters, plaintiff's argument asserts, it is clear the Hispanic candidates who were the choice of the Hispanic community would have been elected. Therefore, plaintiff concludes she proved for preliminary injunction purposes there are at least serious and substantial questions as to whether the votes of the plaintiff and the voting strength of other Hispanic voters living in Val Verde County were diluted by these 800 absentee voters.

In opposition, intervenor Jernigan alleges political cohesion does not exist because the Democratic candidate for United States Senator, Victor Morales, a Hispanic, won the race in Val Verde County. On the other hand, there is some preliminary reason to investigate further whether the contested FPCA votes were broken down as follows:

### FPCA VOTES RECEIVED

Mr. Gonzalez: 113 votes  Mr. Jernigan: 430 votes
Mr. Coronado: 56 votes  Mr. Kachel: 354 votes
Mr. Morales: 122 votes  Senator Gramm: 479 votes

Mr. Jernigan testified he has many Hispanic supporters, one of whom is his wife, and produced a newspaper article showing between fifteen and twenty Hispanic supporters celebrating with him at campaign headquarters on election night. The Court acknowledges there are many instances where Hispanic voters support Anglo candidates and vice versa. However, in the absence of more than anecdotal evidence, the Court cannot disregard plaintiff's raw data indicating cohesiveness.

■ The Court finds plaintiff has raised questions sufficient to meet the test of substantial likelihood of success on her claim the influx of the 800 FPCA ballots diluted the Hispanic vote in violation of section 2 of the Voting Rights Act. 42 U.S.C. § 1973; Thornburg, 478 U.S. at 50–51, 106 S.Ct. at 2766–67.

Even if there was not a Voting Rights Act, federal subject matter jurisdiction exists:

1. Is a federal statute—the Federal Post Card Application law—being improperly implemented?

2. If absent military voters with no intent to return and no ties to Val Verde County are improperly allowed to vote, is the local civilian population subject to being overwhelmed? See Carrington, 380 U.S. at 93 [85 S.Ct. at 779].

3. Will 500 (20%) new absentee votes in Precinct 1, not accounted for in the 1990 redistricting process, violate federal concepts of "one man, one vote"? See Baker v. Carr, 369 U.S. 186, 207–08 [82 S.Ct. 691, 704–05, 7 L.Ed.2d 663] (1962).

### 2. Substantial Threat of Irreparable Injury

■ The second factor is a substantial threat of irreparable injury if the injunction is not granted. Rodriguez, 66 F.3d at 97. An injury is irreparable if it cannot be undone through monetary remedies. Spiegel v. City of Houston, 636 F.2d 997, 1001 (5th Cir.1981). To show irreparable injury if the threatened action is not enjoined, it is not necessary to demonstrate that the harm is

inevitable and irreparable. *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir.1986); *Finlan*, 888 F.Supp. at 791. The movant need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages will not fully repair the harm. *Humana, Inc.*, 804 F.2d at 1394; *Finlan*, 888 F.Supp. at 791. The Court finds plaintiff, and other voters in Val Verde County, would be irreparably harmed by elected officials taking office as a result of votes improperly allowed in violation of the Texas Election Code and the Voting Rights Act, a harm monetary damages cannot address.

### *3. Threatened Injury to the Movant*

■ The third factor is that the threatened injury to the movant outweighs the threatened injury to the nonmovant. *Rodriguez*, 66 F.3d at 97. It is not enough for the movant to demonstrate harm of the same magnitude as would be suffered by the nonmovant if the injunction is issued. *See generally Apple Barrel Prods., Inc.*, 730 F.2d at 389–91. Moreover, the balance of harm is not presumed in the movant's favor merely by a showing of substantial likelihood on the merits. *See id.* The Court has concluded plaintiff will be irreparably harmed if elected officials are not enjoined from taking office pursuant to improperly counted votes in the challenged races in violation of federal Voting Rights Act. The County has demonstrated no potential harm to it from granting the preliminary injunction. The intervenors contend they will be irreparably harmed because they cannot take their oaths of office at this time. However, keeping Mr. Kachel out of office does not put Mr. Coronado in office. Although Mr. Gonzalez remains temporarily as sheriff, it is important to maintain stability and avoid the possibility of multiple changes and to keep the status quo. *See Peel v. Crew*, No. 96 Civ. 7154 (RWS), 1996 WL 719378, at *6 (S.D.N.Y. Dec. 13, 1996) ("[R]emoving the existing trustees and reinstating the elected board members several months after [they left office] would disrupt the current administration of the school district."). The Court concludes that, balancing the harms, the threatened injury to plaintiff out-weighs the threatened injury to the County and the intervenors.

### *4. Disservice to the Public Interest*

■ The fourth and final factor is that the granting of a preliminary injunction will not disserve the public interest. *Rodriguez*, 66 F.3d at 97. The Fifth Circuit affirmed a district court's determination that "the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Nobby Lobby, Inc. v. City of Dallas*, 767 F.Supp. 801, 821 (N.D.Tex.1991), *aff'd*, 970 F.2d 82 (5th Cir.1992); *see also Alvarez*, 844 S.W.2d at 249. Guided by these principles, and considering all of the factors discussed above, the Court finds maintaining the status quo through a preliminary injunction will not disserve the public interest.

### *CONCLUSION*

The public must have confidence that the election process is fair.... Those who have studied history and have observed the fragility of democratic institutions in our own time realize that one of our country's most precious possessions is ... the widespread acceptance of election results. Repeated abuse ... can chip away at public respect for our legal institutions and undermine the willingness of losing candidates to accept the results.

*Alvarez v. Espinoza*, 844 S.W.2d 238, 249 (Tex.App.—San Antonio 1992, writ dism'd w.o.j.).

In spite of and in addition to the unfortunately shrill voting rights ethnic issue raised by this dispute, the Court holds there are other equally serious questions concerning the conduct and validity of the election necessitating further development, discovery, and litigation in state or federal court:

1. How many of the 800 contested absent voters do not have a bona fide intent to return to Val Verde County and indicia of ties to the Val Verde community thereby precluding them under Texas law from voting in local elections?

2. Do the FPCA application forms comply with federal and Texas statutes and regulations?

3. Should several hundred of the FPCA applications have been rejected by the Val Verde County Clerk because of incomplete information?

4. Does the influx of 500 (20%) nonresident voters in Precinct 1 unaccounted for in the 1990 redistricting process violate federal law as enunciated in *Baker v. Carr*, 369 U.S. 186, 207–08 (1962)?

5. Can any of the tens of thousands of Air Force personnel stationed at Laughlin Air Force Base in the last twenty years vote in Val Verde county local elections? *See Carrington*, 380 U.S. at 93 (Texas has legitimate interest in "immunizing its electorate from the concentrated balloting of military personnel, whose collective voice may overwhelm a small local civilian community.")

Accordingly, the preliminary injunction is GRANTED maintaining the status quo in the affected offices of sheriff and county commissioner of Precinct 1 of Val Verde County, Texas. This case is ABATED pending resolution of the state law issues. The motion to dismiss is DENIED. Plaintiff, Intervenor Gonzalez, and Intervenor Coronado shall each post a bond in the amount of $10,000 with the Clerk of the Court. FED.R.CIV.P. 65(c) (upon determining plaintiff's motion for preliminary injunction should be granted, court must determine amount of an appropriate bond).

The ultimate goal must be fair elections perceived by the electorate to be conducted on a level playing field with no candidate, Democrat or Republican, being the beneficiary of unqualified votes.

It is so ORDERED.

APPENDIX